# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARCUS ROBINSON, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Respondent. ) | Judge Joan B. Gottschall <br><br> Civil Case No. 08 C 5677 <br> Criminal Case No. 04 CR 1090-2 |

## MEMORANDUM OPINION & ORDER

Petitioner Marcus Robinson moves the court to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. Robinson challenges his conviction on two grounds. He first argues that his trial counsel was ineffective, in violation of the Sixth Amendment, for failing to adequately cross-examine a witness and for failing to object to the government's closing statements, both related to the issue of whether Robinson had engaged in transactions involving crack rather than powder cocaine. Second, he claims that the statutory enhancement applied to his sentence pursuant to 21 U.S.C. § 851, because of his prior felony conviction, and his resulting mandatory minimum sentence under § 841(b), violated the Fifth Amendment's due process clause. For the following reasons, the court concludes that Robinson's claims lack merit and denies the petition.

### I. BACKGROUND

Robinson was arrested in February 2005. On March 10, 2005, a grand jury charged him with seven of thirty-seven counts of an indictment that involved numerous co-defendants. The defendants allegedly conspired to distribute controlled substances.

Count I charged Robinson with conspiring to distribute and possess with intent to distribute more than 500 grams of mixtures containing cocaine and more than 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of 21 U.S.C. § 846. Count XXI charged Robinson with knowingly and intentionally possessing with intent to distribute mixtures containing in excess of 5 grams of cocaine base in the form of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Counts XII, XXII, XXIV, XXV, and XXVI charged Robinson with using a telephone in committing and in causing and facilitating the drug offenses, in violation of 21 U.S.C. § 843(b).

Robinson was tried before a jury beginning on February 6, 2006. He was represented at trial by Douglas Rathe. Shortly before trial, the government sent Rathe a letter regarding one of Robinson's former co-defendants, James Cross, who was to testify for the prosecution at trial:

> For your information, during a pretrial interview with the government, James Cross indicated he used marijuana in the past. Also, during pretrial interviews, Cross discussed the the [sic] June 25, 2004 transaction in which he asked Milton Patterson to do him a favor by providing drugs to Marcus Robinson. Cross indicated that he thought he directed Patterson to obtain the drugs from a jacket pocket in a closet in the basement of Patterson's house (where Cross lived). Cross also said that he was not sure whether crack or powder cocaine was provided to Robinson on this occasion, but thinks it was probably powder. When shown a copy of the factual basis of his plea agreement, which stated that the substance provided on this occasion was crack cocaine; Cross indicated he did not read the facts in the plea agreement very well. Cross indicated that he provided both crack cocaine and powder cocaine to Robinson during their narcotics relationship with each other.

(Pet'r's Mot. to Vacate Sentence Ex. A, ECF No. 1.) This letter was not introduced into evidence during the trial to impeach Cross, although—as discussed below—whether Cross provided Robinson with crack or powder cocaine was a key issue is Cross's testimony.

At trial, the government presented recordings obtained through a wiretap that had been placed on Cross's phones from May 21 to June 16, 2004, and again from June 22 to July 21, 2004. Cross testified as to the content of the telephone calls and his transactions with Robinson. At the time of the calls, Cross did not know that his conversations were being recorded. (Jury Trial Tr. 108.) He stated that he was arrested in December 2004 and charged with conspiracy to distribute crack and powder cocaine. (Tr. 103.) He agreed to cooperate with the government as part of a plea agreement, in exchange for the government's recommendation of an eighteen-year sentence. (Tr. 104.) Cross testified that he had previous convictions for drug distribution and sexual abuse. (Tr. 105.) On cross-examination by Rathe, Cross stated that he had agreed to cooperate with the FBI because he was facing a possible sentence of thirty years to life imprisonment. (Tr. 191.) Cross admitted that he was testifying in order to get out of prison one day. (Tr. 258.)

Cross testified that during Summer 2004, he supplied Robinson with both powder and crack cocaine in "distribution amounts." (Tr. 111, 115.) He testified that he sold Robinson drugs on several occasions. (Tr. 115.) Interpreting the government's wiretap recordings, Cross testified that the word "crack" was not used in his neighborhood; "cooked" or "hard" were the terms used to refer to crack cocaine. (Tr. 203.) Cross testified that he kept no records of drug sales to Robinson and that he was testifying from memory about events that had happened almost two years before the trial. (Tr. 195.)

Cross testified that on June 10, 2004, he sold Robinson "cooked" cocaine, but he did not recall the quantity. (Tr. 211.) On a wiretap recording made on June 12, 2004, Robinson stated, "I'm gonna need something soon," which Cross testified meant that Robinson was requesting "some drugs." (Tr. 143.) Cross testified that he usually

provided Robinson with "a quarter ounce or a half an ounce" of "[h]ard, cooked" cocaine. (Tr. 150.)

During a call recorded on June 25, 2004, Robinson told Cross, "I need something," and then said "an onion." Cross testified that the term "onion" meant "an ounce." (Tr. 152.) He explained on cross-examination that an "onion" could refer to an ounce of either powder or crack cocaine, but that the drugs involved in the transaction on that date were "cooked." (Tr. 221, 224.) On a call recorded later that day, Cross asked his cousin, Milton Patterson, to "serve Robinson" with an ounce of cocaine. (Tr. 154-55.) Cross stated that he told Patterson that he could find the cocaine in a suit pocket in the basement of Patterson's home, where Cross was living. (Tr. 230.) Cross was not present when Patterson gave Robinson the baggie of drugs. (Tr. 231.) The government played a wiretap recording from later that evening, during which Cross spoke to Robinson again. Robinson said, "Yeah, I got it." (Tr. 155.) Cross testified that this meant that Patterson had given Robinson the ounce of cocaine. (Tr. 156.)

The government then brought out the fact that Cross had previously told the government that he thought he had sold Robinson powder, not crack, cocaine on June 25, 2004. The prosecutor asked Cross to explain how he knew, based on the recorded phone calls, that it was in fact crack that had been provided to Robinson on that date:

> Q. . . . you testified today, Mr. Cross, that it was your understanding that Robinson was asking for crack cocaine, is that right?
>
> A. Yes.
>
> Q. In previous meetings with the government did you ever indicate that you thought Robinson was asking for a different kind of drug?
>
> A. Yes, at one point I thought it was powder, it had been so long.

4

> Q. Why - - why, Mr. Cross, do you believe that it's crack cocaine rather than powder cocaine?
>
> A. When I heard the part when I said I did something to it, so that's when I knew it was crack.
>
> Q. What are you referring to with your last statement, the part that you did something to it?
>
> A. Cooked it.
>
> Q. Let me direct your attention to lines 8 and 9. You say "Everything I do look good." What did you mean by that, Mr. Cross?
>
> A. Everything I touch as far as the drugs look good.

(Tr. 156-57.) On cross-examination, Rathe asked Cross about inconsistent statements he had made to the government about whether the transaction involved crack:

> Q. Did you meet with the government a few days before trial to get ready for your trial preparation?
>
> A. Yes.
>
> …
>
> Q. And at that time did you tell the government that as far as you believed, that you had – did you tell the government that you had directed Patterson to obtain the drugs from a jacket pocket in a closet in the basement of Patterson's house?
>
> A. Yes.
>
> Q. Is that where you lived as well?
>
> A. Yes.
>
> Q. And did you say that you were not sure whether it was crack or powder that was provided to Robinson on this occasion, but you think it was probably powder?
>
> A. No, I know what it was, because --
>
> Q. I'm sorry, the question --
>
> A. It was cooked.

> Q. Your attorney can ask you whatever questions he wants. My question to you is did you tell the government that you probably thought it was powder?
>
> A. To my knowledge, it was cooked.
>
> Q. Did you tell the government it was powder?
>
> A. It was cooked.

(Tr. 253-54.)

On redirect, Cross testified that Robinson was one of his regular customers (Tr. 272), and that he supplied cooked and powder cocaine to Robinson in amounts of "anywhere from like a quarter to half ounce. On occasions he bought an ounce or two at a time." (Tr. 271.) On re-cross, Rathe asked again about the June 25, 2004 transaction:

> Q. June 25, 2004 is pretty set out in the transcript except for one thing, and that is you say it was cooked . . . but you told the U.S. Attorney it could be powder. Do you remember that?
>
> A. I remember the day - - if you look farther down, I said everything I touch look good. That's how I knew it was cooked.
>
> Q. But you deal with both cooked and powder, is that correct?
>
> A. True.

(Tr. 276-77.) Cross admitted that he didn't remember the dates and amounts of cocaine sold to Robinson during the sixty day period during which the wiretap was in place. (Tr. 277.) On further redirect, the government asked Cross what he meant when he said "Everything I do looked good," on the June 25, 2004, recording. He explained, "Everything cooked looked good." (Tr. 282.) Rathe returned to the topic on further re-cross:

> Q. When you use the word "Everything I do look good," are you referring to everything you do with drugs looks good?
>
> A. No, I'm talking about everything I whip up cooked.

6

> Q. So you're not talking about everything you do, both powder and crack. "Everything" in your interpretation, your understanding, simply means everything you cook?
>
> A. On this particular conversation that I'm having, yes, that's what I'm talking about, cooked.
>
> Q. But in your drug dealing business, everything you do is good whether it's powder or cooked, isn't it?
>
> A. I don't have to do anything to powder.

(Tr. 283.)

Later in the trial, Milton Patterson testified that he pleaded guilty to selling an ounce of crack cocaine to Robinson on June 25, 2004. (Tr. 385.) Based on his plea agreement, he expected to serve thirty-one months in prison; had he not cooperated with the government, he would be subject to a forty-six month sentence. (Tr. 386, 397.) Patterson testified that Cross called him on June 25, 2004, and told him he wanted him to "go downstairs and look in one of his pants that he had placed where he had an ounce of crack cocaine and give it to Marcus Robinson." (Tr. 387.) Robinson then came to the house, and Patterson gave him an ounce of crack wrapped in plastic bags. (Tr. 388.) On cross-examination, Patterson stated that the drugs were on a shelf in the basement "in a hat." (Tr. 392.) He stated that the drugs felt hard and looked like a round rock about an inch in diameter. (Tr. 395.)

During its closing statement, the government quoted Robinson's recorded conversation with Cross the evening of June 25, 2004: "[Cross asked,] 'Did you see him? Yeah, I got it. Look good too.' Then Cross says 'Everything I do look good.' He got it and you know it's crack." (Tr. 452.) The prosecutor continued, "How do you know that the 'onion' was crack cocaine? Well, you remember that call. 'Everything I do looks good.'" (Tr. 456.)

7

During the defense's closing statement, Rathe argued that Robinson was not a member of a conspiracy, but was merely Cross's customer. (Tr. 476.) As to whether Robinson had purchased crack from Cross, Rathe argued that Cross did not remember most of the transactions at issue. (Tr. 470.) He pointed out that the reference to an "onion" was not necessarily to crack and that there was no way to tell that any transactions involved crack because no drugs were recovered from Robinson when he was arrested. (Tr. 477-78.) He further argued that the case rested on the testimony of witnesses who had an incentive to do what they could to help themselves. (Tr. 478-79.) Moreover, Cross's and Patterson's stories about the transaction of June 24, 2004, were not the same. For example, Cross stated that he kept the cocaine in his suit coat pocket, while Patterson stated that he found it in a hat. (Tr. 480.) Rathe concluded by arguing that the government had "to prove that this was crack cocaine" and had not done so beyond a reasonable doubt. (Tr. 484.)

On February 9, 2006, Robinson was found guilty of all counts. Regarding Count I, the jury found that Robinson participated in a conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base in the form of crack cocaine and a measurable amount but less than 500 grams of cocaine. Regarding Count XXI, the jury found that on June 25, 2004, Robinson possessed with intent to distribute 5 grams or more (but less than 50 grams) of cocaine base, in the form of crack cocaine.

The court denied Robinson's motion for acquittal or for a new trial. On February 3, 2006, the government gave notice, pursuant to 12 U.S.C. § 851(a)(1), of its intention to seek increased punishment based on Robinson's prior felony convictions for drug offenses. Given this notice, pursuant to § 841(b), Robinson faced a statutory mandatory

minimum sentence of twenty years for Count I and ten years for Count XXI. The judge denied Robinson's motion for a downward departure. On May 23, 2006, the court sentenced Robinson to terms of 240 months each on Counts I and XXI, and to terms of 48 months each on the remaining counts, all to run concurrently. Robinson was also sentenced to ten years of supervised release. During the sentencing, the judge noted that Robinson had "a substantial and extensive" history of criminal misconduct. He stated that he would give the same sentence regardless of whether the statutory enhancement applied. (Tr. 33.) The judge emphasized that dealing cocaine was a serious offense, that the sentence had to reflect a need for incapacitation, and that he was "tempted to go higher." The Seventh Circuit denied Robinson's appeal on April 26, 2007. Robinson filed a § 2255 petition on October 6, 2008.

## II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255, a person convicted of a federal crime may move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). If the petition is successful, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.* § 2255(b).

Post-conviction relief is "an extraordinary remedy" because a petitioner has already "had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Relief "is appropriate only for 'an error of law that is jurisdictional,

constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)). In deciding a § 2255 motion, "evidence and inferences drawn from it are viewed in a light most favorable to the government." *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000).

### III. ANALYSIS

**A. Ineffective Assistance of Trial Counsel**

Robinson claims that this trial counsel was ineffective for 1) failing to use impeachment evidence to cross-examine witness James Cross and 2) failing to object to the government's argument during closing. Claims of ineffective assistance of counsel may be raised during a collateral challenge even if the claim was not raised on direct appeal. *Massaro v. United States*, 538 U.S. 500 (2003). To prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In order to establish deficient performance, a petitioner must establish "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 690). Judicial scrutiny of counsel's performance is "most deferential." *Id.* In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. An ineffective assistance of counsel claim can fail for lack of prejudice "without ever considering the question of counsel's actual performance." *United States v. Taylor*, 569 F.3d 742, 748 (7th Cir. 2009).

    1. Impeachment of James Cross

Cross was a central witness to the government's case. Along with the wiretap recordings and Patterson's testimony, the government used Cross's testimony to prove that the June 25, 2004, sale of drugs to Robinson involved crack rather than powder cocaine. The jury concluded that Robinson was guilty of possessing with intent to distribute between 5 and 50 grams of crack. As there was little other evidence as to the specific quantities and types of drugs purchased by Robinson, and no drugs were recovered from Robinson, the ounce (28.35 grams) of drugs Robinson allegedly purchased on June 25, 2004, may well have formed the basis for the jury's conclusion that Robinson was guilty under Count XXI of possession of crack cocaine.

Robinson contends that the letter sent to Rathe by the government shortly before trial would have demonstrated that Cross was interested only in conforming to the provisions of his plea agreement, not in telling the truth about the type of drugs he sold Robinson. He argues that Rathe's failure to introduce the government's letter into evidence therefore rendered Rathe's performance deficient.

The court disagrees. Although the jury ultimately believed Cross's and Patterson's testimony about selling Robinson crack cocaine on June 25, 2004, Rathe's cross-examination of Cross was not deficient. The government referred to Cross's prior statement to the government during direct examination. On cross-examination, Rathe

11

specifically asked Cross whether he had previously told the government that the transaction involved powder rather than crack cocaine. He pressed Cross on this point on both cross-examination and re-cross. He also addressed the fact that Cross did not remember the details of his transactions with Robinson, and pointed out inconsistencies between Cross's and Patterson's accounts of the transaction. Rathe also brought out the fact that Cross had an interest in cooperating with the government to obtain a reduced sentence.

In response to Rathe's questioning, Cross repeatedly insisted that he had sold Robinson "hard" or "cooked" cocaine on June 25, 2004, based on the fact that he stated on the recorded phone call, "Everything I do look good." Given Cross's testimony, the court concludes that introducing the letter into evidence would have done little to undermine Cross's testimony further. The letter does not clearly establish that the June 25, 2004, sale involved powder cocaine; rather, it says that Cross was not sure what kind of drugs he sold Robinson. More importantly, the letter does not undermine Cross's interpretation of his own statement on the wiretap recording that "Everything I do look good." Introducing the letter might actually have been damaging to the defense. The letter provides additional evidence that Cross provided Robinson with drugs, including crack cocaine. And each time Rathe returned to the topic of whether Cross sold Robinson powder or crack cocaine, Cross was afforded another opportunity to explain his prior inconsistent statement to the jury, and to explain why, after listening to the wiretap recordings, he believed that he had in fact sold Robinson crack. The court concludes that Rathe acted reasonably and competently in impeaching Cross's testimony using other methods.

### 2. Failure to Challenge the Prosecution's Closing Statements

The government stated at the close of its case that the June 25, 2004, sale involved crack. Robinson contends that his attorney should have objected to the statement and was ineffective for failing to do so. The court finds no valid basis, however, on which Rathe could have made such an objection. The government was commenting on evidence in the record, specifically Cross's testimony as to why he believed he had sold Robinson crack. The government asked the jury to infer from Cross's statement on the wiretap recording that "Everything I do look good" that he had cooked the cocaine. "Attorneys have . . . leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize the strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).

Moreover, during Rathe's own closing statement, he argued strongly that the government had failed to prove that the June 25, 2004, sale involved crack. The court concludes that Rathe's performance during the closing arguments was not deficient, and that Robinson was not deprived of his Sixth Amendment right to counsel.

### B. Constitutionality of the Mandatory Minimum Sentence

As Robinson had been convicted of a prior drug felony, a statutory enhancement applied to his sentence, pursuant to 21 U.S.C. § 851. He was thus subject to a twenty-year mandatory minimum sentence for Count I, pursuant to § 841(b)(1). Robinson asserts that the sentence violates the due process clause of the Fifth Amendment and that it should be vacated because it is excessive and greater than necessary to punish him for the crimes he committed.

District courts lack the authority to refuse to impose a mandatory minimum sentence, unless authorized to do so by statute. *U.S. v. Roberson*, 474 F.3d 432, 436-437 (7th Cir. 2007) (noting that 18 U.S.C. § 3553(a) is a "very general statute [that] cannot be understood to authorize courts to sentence below minimums specifically prescribed by Congress"). Even if the district court itself considers the mandatory minimum sentence unreasonable, the imposition of the sentence does not violate a defendant's right to due process. *See id.* The Seventh Circuit has made clear that mandatory minimum sentences do not violate the Fifth Amendment. *United States v. Nigg*, 667 F.3d 929, 935 (7th Cir. 2012) (affirming mandatory minimum sentence under Armed Career Criminal Act); *United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008) ("[T]he Supreme Court and this court have consistently held that mandatory minimum sentences are not a violation of a defendant's due process rights.").

The court acknowledges that the crack-powder cocaine disparity in the mandatory minimum sentences of § 841 in place at the time of Robinson's sentencing has been roundly criticized by the Sentencing Commission. *See Kimbrough v. United States*, 552 U.S. 85, 98 (2007). But despite the disparity in the mandatory minimums in effect at the time of Robinson's sentence, the imposition of a twenty-year sentence was not a due process violation. In *United States v. Lawrence*, 951 F.2d 751, 755 (7th Cir. 1991), the Seventh Circuit held "that Congress' enactment of different penalties for cocaine base and cocaine evinces a rational purpose and does not violate the Due Process clause."

The Seventh Circuit revisited that question after the Fair Sentencing Act of 2010 amended the Controlled Substances Act. In *United States v. Moore*, 644 F.3d 553 (7th Cir. 2011), the court held that despite Congress's amendments to the act, the appellee

failed to "demonstrate that Congress has no reasonable basis for believing that crack is more dangerous than powder cocaine." *Id.* at 556 (citing *Vance v. Bradley*, 440 U.S. 93, 111 (1979)). The appellate court rejected the argument that the disparity in sentencing between convictions involving powder and crack cocaine was so great that it violated due process:

> [T]hat argument relates to the wisdom of the approach Congress selected to address the problems associated with crack cocaine, something we have no authority to second-guess. As such, whether we believe another approach to the issue—such as a lower crack-to-powder ratio—would be preferable is irrelevant to our analysis. Because Moore has not demonstrated that the crack-powder disparity rests on grounds wholly irrelevant to the achievement of Congress's objective, it survives rational-basis review.

*Id.* at 557 (internal citations, quotation marks, and alteration omitted). Other courts have likewise rejected the argument that the mandatory minimum sentences set out in § 841 violate due process. *United States v. Johnson*, 413 F. App'x. 783, 784 (6th Cir. 2011); *United States v. Grant*, 312 F. App'x 39, 41 (9th Cir. 2009) (reversing district court for sentencing below the mandatory minimum); *see also United States v. Labrada-Bustamante*, 428 F.3d 1252, 1265 (9th Cir. 2005) (upholding twenty-year mandatory minimum sentence under § 841 against an Eighth Amendment challenge).

Robinson also suggests that the twenty-year sentence conflicts with 18 U.S.C. § 3553(a). But even were that so, it would not make the sentence unconstitutional. The Seventh Circuit has acknowledged that, "in some instances, mandatory minimum sentences prevent a judge from fashioning a sentence for a particular defendant based on that defendant's unique characteristics." *Nigg*, 667 F.3d at 935. Yet it "has never recognized a constitutional right to individualized sentencing in non-capital cases. . . . [A]

sentencing scheme not considering individual degrees of culpability would clearly be constitutional." *Id.* (international quotations and citation omitted).

Furthermore, in this case, the sentencing transcript reveals that, in the view of the sentencing judge, there was no genuine conflict between the sentence Robinson received and the § 3553(a) factors. The court would not have been required to sentence Robinson below a twenty-year term even were the mandatory minimum inapplicable. The judge indicated that he would have imposed a similar sentence without the statutory enhancement, and he imposed terms of 240 months for both Count I and Count XXI, although the mandatory minimum sentence for Count XXI was only ten years.

## IV. Conclusion

Because Robinson's counsel was not constitutionally ineffective, and because Robinson's sentence comported with the due process requirements of the Fifth Amendment, the court denies his petition to vacate his conviction and sentence pursuant to § 2255.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 14, 2013